NOTICE
Decision filed 06/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230520-U

NO. 5-23-0520

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 19-CF-3239 |
| | ) | |
| DYLAN C. WOLF, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justice Boie concurred in the judgment.
Presiding Justice McHaney concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for aggravated unlawful use of a weapon without a Firearm Owners Identification card is affirmed where the statute defining that offense is not facially unconstitutional.

¶ 2    The defendant, Dylan C. Wolf, appeals the circuit court's June 15, 2023, denial of his petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401(f) (West 2022)). On appeal, the defendant challenges his conviction for aggravated unlawful use of a weapon (AUUW) without a Firearm Owners Identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2018)), arguing that the statute is unconstitutional on its face and as applied to him as an adult under 21 years of age following the United States

1

Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4       On October 8, 2019, a few days before his nineteenth birthday, the defendant was charged by amended information[1] in Madison County case 19-CF-3239 with one count of AUUW without a FOID card, a nonprobationable Class 4 felony, and one count of unlawful possession of cannabis with intent to deliver, a Class 4 felony. That same day, the defendant posted bail and was released from custody.

¶ 5       Less than two weeks later, on October 21, 2019, the State filed a motion to revoke the defendant's bail based on the commission of new offenses on or about October 16, 2019. The defendant was charged in an additional Madison County case, 19-CF-3369, with two counts of home invasion and one count of armed robbery, all Class X felonies. The defendant remained in custody without a bond.

¶ 6       On January 26, 2021, in both cases, the defendant entered a partially negotiated open plea. In 19-CF-3239, the defendant pled guilty to one count of AUUW without a FOID card, and the State agreed to dismiss the remaining count. In 19-CF-3369, the defendant pled guilty to one count of residential burglary and one count of attempted armed robbery, both Class 1 felonies. The State agreed to dismiss the remaining counts.

¶ 7       As a factual basis for the AUUW count, the parties stipulated that the police stopped the defendant as he was driving in Alton; that a search of the vehicle revealed a loaded handgun under the driver's seat; and that the defendant did not possess a currently valid FOID card. On June 30,

---

[1]The initial information, also filed on October 8, 2019, alleged that the defendant was also in violation of section 24-1.6(a)(3)(A-5) of the AUUW statute that requires a currently valid license under the Firearm Concealed Carry Act. However, the amended information deleted that portion.

2021, the circuit court accepted the parties' agreed sentencing recommendation and imposed two years' imprisonment for AUUW in 19-CF-3239, and eight years' imprisonment in 19-CF-3369 to run consecutively, for a total of 10 years.

¶ 8    On March 10, 2023, the defendant filed a *pro se* petition for relief from judgment under section 2-1401(f) of the Code (735 ILCS 5/2-1401(f) (West 2022)), arguing that his AUUW conviction should be vacated because the statute under which he was convicted was found facially unconstitutional by *People v. Aguilar*, 2013 IL 112116, and *People v. McClinton*, 2018 IL App (3d) 160648. On April 14, 2023, the State moved to dismiss the defendant's section 2-1401(f) petition, arguing that the holdings in *Aguilar* and *McClinton* did not apply to the section of the AUUW statute at issue in his case. On June 15, 2023, the trial court dismissed the defendant's petition in a written order. This appeal follows.

¶ 9                                    II. ANALYSIS

¶ 10    On appeal, the defendant abandons the arguments raised in his section 2-1401 petition. Instead, for the first time on appeal, he argues that, following *Bruen*, section 24-1.6(a)(1), (a)(3)(C) of the AUUW statute, which criminalizes possession of a firearm without a FOID card, violates the second amendment to the United States Constitution (U.S. Const., amend. II) on its face and as applied to him. He specifically challenges the statute's requirement that a defendant possess a FOID card. In addition, he contends the statute is unconstitutional as applied to him because his conviction resulted from the enforcement of an unconstitutional age-based restriction on firearm possession under the FOID Card Act (430 ILCS 65/1 *et seq.* (West 2004)).

¶ 11    While the foregoing arguments were not raised by the defendant in the circuit court, a challenge to the facial constitutionality of a statute is exempt from forfeiture and may be raised at any time. *People v. Thompson*, 2015 IL 118151, ¶ 32. A statute that is later declared

3

unconstitutional and void *ab initio* was constitutionally infirm from the moment of its enactment and, therefore, unenforceable. *Id.* To the extent that the defendant seeks to raise an as-applied challenge for the first time on appeal, that claim is forfeited. *Id.* ¶¶ 35-37. "[T]he void *ab intitio* doctrine does *not* apply to an as-applied constitutional challenge." (Emphasis in original.) *Id.* ¶ 32. An as-applied challenge is "not one of those recognized by this court as being exempt from the typical rules of forfeiture and procedural bars in section 2-1401 of the Code." *Id.* ¶ 39.

¶ 12    The defendant argues that the record is sufficiently developed for appellate review of his as-applied challenge to avoid forfeiture. He argues that his position is supported by *People v. Holman*, 2017 IL 120655, ¶¶ 29-32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42. We disagree with the defendant's interpretation of *Holman* where the Illinois Supreme Court reiterates the rule set forth in *Thompson*, "that a defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record." *Holman*, 2017 IL 120655, ¶ 32. The *Holman* court then clarified that *People v. Davis*, 2014 IL 115595, "creates a very narrow exception to that rule for an as-applied *Miller* claim for which the record is sufficiently developed for appellate review." *Id.* Thus, the "very narrow exception" recognized by *Holman* does not apply here where defendant is not making an as-applied *Miller* claim. Accordingly, we find the defendant forfeited his as-applied challenge because he failed to raise the issue in his section 2-1401 petition before the circuit court. When there has been no evidentiary hearing and no findings of fact, the constitutional challenge must be facial. *People v. Mosley*, 2015 IL 115872, ¶ 49. Thus, we will address only the defendant's facial challenge to the statute.

¶ 13    Constitutional challenges carry the heavy burden of rebutting the strong judicial presumption of a statute's constitutionality. *People v. Rizzo*, 2016 IL 118599, ¶ 23. Meeting that

4

burden requires the party challenging a statute to "clearly establish its invalidity." *People v. Mosley*, 2015 IL 115872, ¶ 22. "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *Rizzo*, 2016 IL 118599, ¶ 23. Constitutional challenges to statutes present a question of law, and we review such questions *de novo*. *Aguilar*, 2013 IL 112116, ¶ 15.

¶ 14    "[A] facial challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant." *Thompson*, 2015 IL 118151, ¶ 36. A party raising a facial challenge to a statute faces a particularly heavy burden. *People v. Eubanks*, 2019 IL 123525, ¶ 34; see *Burns v. Municipal Officers Electoral Board of the Village of Elk Grove Village*, 2020 IL 125714, ¶ 13 ("facial challenge to a statute is the most difficult challenge"). A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid. *Id.* The particular facts related to the challenging party are irrelevant. *Rizzo*, 2016 IL 118599, ¶ 24. If it is reasonably possible to construe the statute in a way that preserves its constitutionality, we must do so. *Id.*

¶ 15    The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In Illinois, the right to bear arms is governed by both civil and criminal statutes. *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 50. The AUUW statute requires an individual to obtain a FOID card in order to possess a firearm. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2004). The FOID Card Act describes the requirements for obtaining a FOID card and states that "[n]o person may acquire or possess any firearm *** without having in his or her possession a [FOID] Card previously issued in his or her name by the Department of State Police under the provisions of this Act." 430 ILCS 65/2(a)(1) (West 2004).

5

¶ 16    In 1968, the Illinois General Assembly passed the FOID Card Act to "identify[ ] persons who are not qualified to acquire or possess firearms, firearm ammunition, stun guns, and tasers." 430 ILCS 65/1 (West 2020). In line with that goal, the FOID Card Act requires that a person wishing to acquire or possess a firearm first obtain a FOID card from the Illinois State Police. *Id.* § 2(a)(1). An applicant must pay a $10 fee to the Illinois State Police. *Id.* § 5(a). Applicants must also submit proof of Illinois residence, show they are at least 21 years of age, and provide a photograph. *Id.* § 4(a)(2)(i), (a)(2)(xiv), (a-20). Upon receipt of the application, the Illinois State Police conducts an

> "automated search of its criminal history record information files and those of the Federal Bureau of Investigation, including the National Instant Criminal Background Check System, and of the files of the Department of Human Services relating to mental health and developmental disabilities to obtain any felony conviction or patient hospitalization information which would disqualify a person from obtaining or require revocation of a currently valid Firearm Owner's Identification Card." *Id.* § 3.1(b).

¶ 17    If applicants meet these requirements, the Illinois State Police *shall* issue them a FOID card within 30 days of applying. *Id.* § 5(a). Upon issuance, a FOID card remains valid for 10 years. *Id.* § 7(a). Illinois is known as a *shall-issue* state because the police must issue a FOID card to any applicant who fulfills the criteria set forth in the statute. *Id.* § 5. In contrast to the New York regulations considered in *Bruen*, the state of Illinois does not have discretion to deny an applicant based on requirements or factors not explicitly set forth in the statute.

¶ 18    The defendant argues that, following *Bruen*, Illinois's ban on possessing a firearm without a FOID card is facially unconstitutional. We note that the defendant in his opening brief argues that the circuit court erred when it dismissed his "claim that his aggravated unlawful use of a

6

weapon conviction for possessing a gun without a FOID card is void where the statute under which he was convicted is unconstitutional under the Second Amendment." Further, the defendant argues that the "circuit court erred because it rejected [his] challenge without applying the standard set forth in *Bruen*." However, the defendant never presented the specific claim he now makes on appeal to the circuit court; instead, he argued that pursuant to the Illinois Supreme Court's decisions in *Aguilar* and *McClinton*, which concerned a separate subpart of the AUUW statute, his conviction was void and previously declared facially unconstitutional. The circuit court never had the opportunity to consider the arguments the defendant now makes on appeal. Nevertheless, the defendant specifically argues that section 24-1.6(a)(1), (a)(3)(C) of the AUUW statute violates the second amendment on its face because the conduct it prohibits—possessing a firearm without first obtaining a FOID card—is protected under the plain text and is inconsistent with the nation's historical tradition of firearm regulation. Relying on *Bruen*, the defendant contends that our nation's history does not include a tradition of imposing criminal punishment on an individual for exercising the right to bear arms without a license.

¶ 19    "*Bruen* fundamentally changed our analysis of laws that implicate the second amendment. The Court rejected the 'means-end' test or any form of interest balancing that lower courts typically applied post-*Heller.*" *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 2024 IL App (3d) 210073, ¶ 37. Under *Bruen*, a court must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, then the Constitution "presumptively protects that conduct" and the government must justify the regulation by showing that it is consistent with the nation's historical tradition of firearm regulation. *Id.*

¶ 20    In the aftermath of *Bruen*, Illinois appellate courts have uniformly rejected second amendment challenges to the validity of convictions based on subsection (a)(3)(C) of the AUUW

statute. While the analysis and reasoning among the Illinois appellate courts varies, the outcome has been the same—a facial challenge to the FOID card requirement fails. Some cases have reasoned that, because the FOID card requirement of the AUUW statute can be validly applied in some circumstances, it is not facially unconstitutional. See, *e.g.*, *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 30 (citing *People v. Mofreh*, 2024 IL App (1st) 230524-U, ¶¶ 49-51); see also *People v. Norvell*, 2025 IL App (1st) 231728-U, ¶ 15. One decision has held that, because a person who violates subsections (a)(1) and (a)(3)(C) of the AUUW statute necessarily also violates the FOID Card Act's civil prohibition of firearm possession without a FOID card, that person's conduct falls outside the plain text of the second amendment. *Hatcher*, 2024 IL App (1st) 220455, ¶ 57. Other courts have determined that the decision in *Bruen* established that shall-issue licensing schemes, like Illinois, are presumptively constitutional. See, *e.g.*, *People v. Thompson*, 2024 IL App (1st) 221031, ¶ 23 (citing *Bruen*, 597 U.S. at 38, 80 (Kavanaugh, J., concurring)) ("Illinois's FOID Card Act establishes an objective shall-issue licensing regime, which *Bruen* recognized was not unconstitutional."); see also *People v. Gunn*, 2023 IL App (1st) 221032, and *People v. Noble*, 2024 IL App (3d) 230089-U. The defendant argues that all of these cases were wrongly decided, but he fails to cite any authority, post-*Bruen*, to support his position that the FOID card requirement of the AUUW statute is unconstitutional on its face.

¶ 21    While we are not bound by the decisions of our sister districts, we may consider them as instructive. See *O'Casek v. Children*'s *Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). We find the analysis in *Noble*, relying on *Gunn*, persuasive. There the Third District, while facing an almost identical challenge to the section of the AUUW statute requiring a FOID card, reasoned that in *Bruen*, after reviewing the relevant history, the Court drew a distinction between "shall-issue" licensing regimes and "may-issue" or discretionary licensing regimes, like the regulations

8

enacted by New York. *Noble*, 2024 IL App (3d) 230089-U, ¶ 15. The *Bruen* Court held that "shall-issue" licensing regimes were not affected by its decision because "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Bruen*, 597 U.S. at 38 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Illinois is a "shall-issue" state that requires the Illinois State Police to issue a FOID card to any applicant who meets the criteria set forth in the statute. *Gunn*, 2023 IL App (1st) 221032, ¶ 16. The Court, in *Bruen*, specifically found that the "decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense." *Bruen*, 597 U.S. at 79. "In particular, the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." *Id.* We need not go through the exercise of applying the test announced in *Bruen* here because Illinois's FOID Card Act establishes an objective "shall-issue" licensing regime, which *Bruen* recognized was not unconstitutional. See *id.* at 38 n.9. Therefore, we reject the defendant's facial challenge and find that his conviction for AUUW does not violate the second amendment.

¶ 22                            III. CONCLUSION

¶ 23    Accordingly, we affirm the defendant's conviction where the version of the AUUW statute defined by section 24-1.6(a)(1), (a)(3)(C) is not facially unconstitutional.

¶ 24    Affirmed.

¶ 25    PRESIDING JUSTICE McHANEY, concurring in part and dissenting in part:

¶ 26    I concur with the majority that the defendant's as-applied constitutional challenge is forfeited and is not exempt from the typical rules of forfeiture and procedural bars in section 2-1401 of the Code. *Thompson*, 2015 IL 118151 ¶ 39. However, with respect to the decision of my

9

colleagues that the FOID Cart Act survives, post-*Bruen*, a facial constitutional challenge, I respectfully dissent.

¶ 27 On appeal, the defendant abandons the arguments raised in his section 2-1401 petition. Instead, he argues that, following *Bruen*, section 24-1.6(a)(1), (a)(3)(C) of the AUUW statute, which criminalizes possession of a firearm without a FOID card, violates the second amendment to the United States Constitution (U.S. Const., amend. II) on its face. He specifically challenges the criminal penalty imposed on his possession of a firearm without a FOID card. The defendant submits that in *Bruen*, the Supreme Court articulated a new test to be applied in determining the constitutionality of a regulation restricting the second amendment's protection of the right to keep and bear arms.

¶ 28 The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 592, 635 (2008), the United States Supreme Court interpreted the second amendment as codifying a preexisting individual right, unconnected with service in the militia, to keep and bear arms for "law-abiding, responsible citizens to use arms in defense of hearth and home." Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court extended the second amendment's individual right to keep and bear arms to the states under the fourteenth amendment. In *Bruen*, petitioners, who sought unrestricted licenses to carry a handgun in public, brought a second amendment challenge to New York's "proper cause" licensing scheme wherein applicants were required to demonstrate a unique need for self-protection distinguishable from that of the general community. *Bruen*, 597 U.S. at 16.

¶ 29    Following *Heller* and *McDonald*, courts developed a "two-step" framework for analyzing second amendment challenges to firearm regulations that combined history with means-end scrutiny. *Id.* at 17. The *Bruen* Court rejected means-end scrutiny in the second amendment context, finding instead that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. In keeping with *Heller*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. The State must then justify its regulation of the conduct by demonstrating that the regulation is consistent with this nation's historical tradition of firearm regulation. *Id.* Only then may a court conclude that the individual's conduct falls outside the second amendment's " 'unqualified command.' " *Id.* (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)). Applying its newly announced analytical framework for evaluating the constitutionality of firearm regulations, the *Bruen* Court found that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

¶ 30    Prior to addressing the merits of the defendant's claim, I note that both parties consistently, yet incorrectly, refer to the Illinois FOID card requirement as a "licensing scheme" similar to the one at issue in *Bruen*. However, the parties, as do most courts, erroneously conflate the FOID Card Act found in 430 ILCS 65/1 *et seq.* (West 2022) with the Firearm Concealed Carry Act found in 430 ILCS 66/1 *et seq.* (West 2022).

¶ 31    In 2013, the Illinois General Assembly passed the Firearm Concealed Carry Act to allow a qualified individual to obtain a license to carry a concealed handgun in public. 430 ILCS 66/10 (West 2022). In order to obtain a concealed carry license, an individual must meet certain criteria

11

including being at least 21 years of age and having a valid FOID card. *Id.* § 25(1), (2), (6). The Illinois State Police "shall" issue to the applicant who meets these and other requirements a concealed carry license within 90 days. *Id.* § 10(a), (e).

¶ 32     In contrast, effective July 1, 1968, the Illinois General Assembly enacted the FOID Card Act "in order to promote and protect the health, safety and welfare of the public." 430 ILCS 65/1 (West 2022). To that end, the legislature enacted "a system of identifying persons who are not qualified to acquire or possess firearms *** within the State of Illinois by the establishment of a system of Firearm Owner's Identification Cards, thereby establishing a practical and workable system by which law enforcement authorities [would] be afforded an opportunity to identify those persons who are prohibited *** from acquiring or possessing firearms." *Id.* The FOID Card Act, which predates the Concealed Carry Act by 45 years, is more akin to a database from which law enforcement agencies can access information. A FOID card shall contain the applicant's name, residence, date of birth, sex, physical description, recent photograph, and signature. Thus, the FOID card program is used by law enforcement to determine the eligibility of applicants who wish to acquire or possess a firearm as part of a purported public safety initiative, while the Concealed Carry Act allows eligible applicants to carry a concealed firearm in public. Although the Concealed Carry Act contains a requirement that an individual must have a valid FOID card before being issued a concealed carry license, these statutes are not interchangeable. The FOID Card Act is a stand-alone statute that is not dependent on the Concealed Carry Act.

¶ 33     The defendant argues that following *Bruen*, Illinois's ban on possessing a firearm without a FOID card is facially unconstitutional. The defendant acknowledges that in *People v. Mosley*, 2015 IL 115872, ¶¶ 31-38, the Illinois Supreme Court upheld the FOID Card Act against a second amendment challenge:

12

"When analyzing the constitutionality of a restriction on the second amendment right to bear arms, we apply the two-part approach this court adopted in *Wilson v. County of Cook*, 2012 IL 112026, ¶ 41. Under this approach, the court first conducts a textual and historical inquiry to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification. *Id.* The regulated activity is categorically unprotected if the challenged law applies to conduct falling outside the scope of the second amendment right. *Id.* However, if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then the court, applying the appropriate level of means-end scrutiny, conducts a second inquiry into the strength of the government's justification for restricting or regulating the exercise of second amendment rights. *Id.* ¶ 42; [citations]." *Mosley*, 2015 IL 115872, ¶ 34.

¶ 34    The two-part approach adopted in *Wilson*, upon which *Mosley* relied, was discarded by *Bruen*. Writing for the majority, Justice Thomas provided a new framework to be applied in determining the constitutionality of a statute under the second amendment: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical traditions of firearm regulation. Only then may a court conclude that the individuals' conduct falls outside the second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24 (quoting *Konigsberg*, 366 U.S. at 50 n.10). "*Bruen* fundamentally changed our analysis of laws that implicate the second amendment. The Court rejected the 'means-end' test or any form of interest balancing that lower courts typically applied post-*Heller*." *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 2024 IL App (3d) 210073, ¶ 37. *Bruen* asserted, "The Second Amendment

13

'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." (Emphasis in original.)" *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635).

¶ 35    As our state supreme court has articulated: "Under the supremacy clause of the federal constitution (U.S. Const., art. VI, cl. 2) '[w]e are bound to follow the United States Supreme Court's interpretation of the Constitution of the United States.' " *People v. Hood*, 2016 IL 118581, ¶ 22 (quoting *People v. Wagener*, 196 Ill. 2d 269, 287 (2001)). Thus, when the United States Supreme Court adopts a particular framework for applying a federal constitutional provision, lower courts are required to follow that framework, regardless of how other courts, including the Illinois Supreme Court, may have approached the issue in other decisions. *Id.* Accordingly, there is no discretion to follow any approach other than the one established in *Bruen*.

¶ 36    The majority concludes that it is unnecessary to "go through the exercise of applying the test announced in *Bruen*" because the FOID Cart Act is an objective "shall-issue" licensing regime, which *Bruen* recognized was not unconstitutional. As authority for this conclusion, my colleagues cite to footnote nine from *Bruen*. *Supra* ¶ 21. Though I disagree with the ultimate holding of the Fourth District in *Guns Save Life, Inc. v. Kelly*, 2025 IL App (4th) 230662, that court was correct in stating that *Bruen*'s footnote nine standing alone, does not establish that the FOID Card Act is constitutional.

> "Footnote nine explains the limits of the Supreme Court's holding in *Bruen*. It also explicitly references only concealed-carry licensing regimes. The FOID Act is a licensing law that broadly regulates the acquisition and possession of firearms, not a narrower regulation of the public carry of firearms. Accordingly, the State cannot rely on footnote

14

nine to obviate the need for *Bruen*'s text and history analysis in the context of a constitutional challenge to the FOID Act." *Kelly*, 2025 IL App (4th) 230662, ¶ 31.

¶ 37 The dissent in *Guns Save Life, Inc. v. Kelly* relevantly expanded on this point:

"[T]he State seems to believe *Bruen* blessed *all* shall-issue licensing regimes. However, footnote nine's language does not support this position.

The 43 shall-issue regimes mentioned in footnote nine are first listed in footnote one. See *Bruen*, 597 at 13 n.1. Footnote one provides contextual citations for the Court's discussion on the nation's various public carry licensing schemes. The Court contrasted New York's 'may issue' law, where applicants had to show a special need for public carry, with laws that had no such requirement, observing, 'But the vast majority of States—43 by our count—are "shall issue" jurisdictions, where authorities must issue *concealed-carry licenses* whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.' (Emphasis added.) *Bruen*, 597 U.S. at 13. Footnote one immediately follows this sentence, and all 43 statutes cited therein are public carry laws. Footnote one's list includes section 10 of Illinois's Concealed Carry Act (430 ILCS 66/10 (West 2022)). If footnote nine deemed any laws presumptively constitutional, it would be these 43 laws only. The FOID Act is not cited in footnote one, or anywhere else in *Bruen*, so we cannot presume the United States Supreme Court has already ruled on its constitutionality." (Emphasis in original.) *Kelly*, 2025 IL App (4th) 230662, ¶¶ 157-58 (DeArmond, J., dissenting).

¶ 38 To determine whether the FOID Card Act violates the second amendment requires the resolution to two questions. First, does the Act target conduct protected by the second

15

amendment's plain text? Second, did the State establish that the Act is consistent with this nation's historical tradition of firearm regulation? When challenging a law under the second amendment, the plaintiff must first show that "the Second Amendment's plain text covers" the "proposed course of conduct." *Bruen*, 597 U.S. at 17, 32. Citing *Bruen*, 597 U.S. at 22-24, the defendant argues that his conduct was presumptively protected by the plain text of the second amendment— that is, the possession of a firearm without a FOID card.

¶ 39 The State counters that the defendant is not afforded second amendment protection because he is not a "law-abiding" citizen as he had a juvenile adjudication, which was later dismissed for reasons not clear in the record, wherein he was charged with the manufacture and delivery of cannabis. The State also notes that while the defendant was on bond in the instant case, he was charged with residential burglary and attempted armed robbery with a firearm to which he later pled guilty. However, the State does not define the term "law-abiding," nor does it cite to any case or statute which defines that term. I find persuasive Justice Thomas's dissent in *United States v. Rahimi*, 602 U.S. 680 (2024), where the government made a similar argument that the second amendment protects only "responsible, law-abiding" citizens or "non-dangerous citizens." *Id.* at 773, 774 (Thomas, J., dissenting). Justice Thomas stated the government's claim that the Supreme Court previously had held that the second amendment protects only "law-abiding, responsible citizens" was specious at best, noting that "the 'law-abiding, dangerous citizen' test [was] the Government's own creation, designed to justify every one of its existing regulations. It has no doctrinal or constitutional mooring." *Id.* at 774. Justice Thomas further elucidated that in *Bruen*, the Supreme Court "used the phrase 'ordinary, law-abiding citizens' merely to describe those who were unable to publicly carry a firearm in New York." *Id.* at 733 n.7 (quoting *Bruen*, 597 U.S. at 9, 15, 31-32, 71). Because the defendant's possession of a firearm was presumptively protected

16

conduct, it then becomes necessary to examine whether the State has demonstrated that the challenged *regulation* is consistent with this nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24.

¶ 40    The State maintains that during the colonial and founding periods, there existed certain offenses which imposed limitations on firearm carry. For example, the common law offense of affray, "or going armed 'to the terror of the people' continued to impose some limits on firearm carry in the antebellum period." *Id.* at 50. The *Bruen* Court found that "[n]one of these restrictions imposed a substantial burden on public carry analogous to that imposed by New York's restrictive licensing regime." *Id.* Although the State correctly notes it may demonstrate that a challenged regulation is consistent with historical tradition by identifying analogous historical regulations that are "relevantly similar" to the challenged law with respect to "how and why the regulations burden a law-abiding citizen's right to armed self-defense" (*id.* at 29), it fails to do so here.

¶ 41    Instead of attempting to demonstrate that the FOID Card Act is consistent with historical regulations, the State elects to rely on either pre-*Bruen* cases (see *People v. Montgomery*, 2016 IL App (1st) 142143, ¶ 1; *People v. Martin*, 2018 IL App (1st) 152249, ¶ 18; *People v. Taylor*, 2013 IL App (1st) 110166, ¶ 32; and *People v. Mosley*, 2015 IL 115872, ¶ 36) or unpublished Rule 23 orders (see *People v. Thompson*, 2023 IL App (1st) 220429-U, ¶ 58; *People v. Kuykendoll*, 2023 IL App (1st) 221266-U; and *People v. Smith*, 2023 IL App (4th) 220958-U).

¶ 42    The State, citing *In re D.B.*, 2023 IL App (1st) 231146-U, an unpublished order under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) from the First District, maintains that *Bruen* recognized the constitutionality of Illinois's licensing regime including the FOID Card Act. I disagree for two reasons. First, *Bruen* did not address the Illinois FOID Card Act; rather, *Bruen* specifically cited the Illinois Concealed Carry Act. See *Bruen*, 597 U.S. at 15 n.1. Second, the

17

*Bruen* Court did not hold that the Illinois concealed carry licensing scheme was constitutional; instead, *Bruen* noted that a vast majority of states, including Illinois, require a permit to carry a handgun in public. *Id.* at 13, 15 n.1. In contrast to New York's concealed carry licensing scheme, these states require authorities to "issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 13. These states are referred to as "shall issue" jurisdictions. *Id.* While the *Bruen* Court made clear that nothing in their analysis should be interpreted to suggest the *unconstitutionality* of the "shall-issue" licensing regimes, it did not foreclose constitutional challenges to the shall-issue regimes under certain circumstances. *Id.* at 39 n.9.

¶ 43     The State correctly notes that "the right to keep and bear arms *in public* has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." (Emphasis added.) *Id.* at 38-39. The defendant acknowledges that *Bruen* concluded the founding-era historical evidence demonstrates "that *the manner* of public carry was subject to reasonable regulation." (Emphasis in original.) *Id.* at 59. The defendant notes, however, that laws regulating "the manner of public carry" were those that limited individuals from carrying deadly weapons in a manner likely to terrorize others; surety statutes that did not directly restrict public carry but provided financial incentives for responsible arms carrying; and restriction on concealed carry. *Id*. The defendant contends that none of these historical analogues come close to the FOID Cart Act, which does not regulate the manner of public carry. Instead, it allows the State to fine or imprison any citizen for possessing a firearm, even privately, without first seeking permission from the government. The FOID Cart Act further conditions governmental permission to possess a firearm

18

upon payment of a fee, both of which must be done every 10 years. That the required FOID Card fee of $10 may be characterized as *de minimis* is unavailing. Once it is conceded that the State has the *power* to impose a fee on firearm possession, there is no limit on the amount of the fee that can be imposed. See *Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 33 (quoting *Boynton v. Kusper*, 112 Ill. 2d 356, 369-70 (1986) ("Once it is conceded that the State has the *power* to impose a special tax on a marriage license, that is, to single out marriage for a special tax consideration, there is no limit on the amount of the tax that may be imposed." (Emphasis in original.))).

¶ 44   As Samuel Adams aptly noted: "The foundation of a people's ruin is often at first laid in small, and almost imperceptible, encroachments upon their liberties." Stacy Schiff, *The Revolutionary* 52 (2022). Equally apt is the reflection of United States Supreme Court Justice William O. Douglas: "As nightfall does not come all at once, neither does oppression. In both instances, there is a twilight when everything remains seemingly unchanged."[2]

¶ 45   The State relies upon a post-*Bruen* case that denied a facial constitutional challenge to the FOID Cart Act, *People v. Gunn*, 2023 IL App (1st) 221032, *reh'g denied* (Oct. 30, 2023), *appeal pending* (Jan. Term 2024). The defendant argues, and we agree, that *Gunn* was wrongly decided. Following *Bruen*, the defendant in *Gunn* made a facial challenge to the FOID Card Act, as well as to the Firearm Concealed Carry Act. *Id.* ¶ 7. The defendant contended that the FOID Card Act was inconsistent with this nation's historical tradition of firearm regulation because it required an individual to disclose personal information and pay a fee to the State, "constitut[ing] an impermissible barrier to the exercise of second amendment rights." *Id.* ¶ 17. In rejecting this argument, the *Gunn* court found that the defendant cited no authority to support his position that

---

[2]William O. Douglas, "A September 10, 1976, letter to the Young Lawyers Section of the Washington State Bar Association," *The Douglas Letters: Selections from the Private Papers of Justice William O. Douglas*, eds. Melvin I. Urofsky and Philip E. Urofasky (Adler & Adler, 1987), 162.

the FOID card was unconstitutional on its face. *Id.* ¶¶ 17-18. This is a fundamental misunderstanding of the duty of the defendant, the State, and the reviewing court as set out in the *Bruen* framework.

¶ 46    Where a defendant demonstrates that the plain text of the second amendment covers the regulated conduct, the State is then *required* to justify its regulation of that conduct by showing that the restriction "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Only then, after the State has met its burden, may a reviewing court conclude that the individual's conduct falls outside the second amendment's protection. *Id.* at 17. In *Gunn*, the court made no reference to the State's burden. Presumably, the State made no attempt to show that regulation of the defendant's conduct was consistent with the nation's historical traditions. Instead, *Gunn* shifted the burden to the defendant to cite authority to support his constitutional claims, which is not a faithful application of the new framework mandated by *Bruen*.

¶ 47    Finally, *Gunn* concluded that because *Bruen* had "explicitly acknowledged that background checks, which are the cornerstone of the FOID Card Act, are permissible," there was no need to engage in a historical analysis of the challenged firearm regulation. *Gunn*, 2023 IL App (1st) 221032, ¶ 19 (citing *Bruen*, 597 U.S. at 38 n.9). I disagree. The fact that *Bruen* included in a footnote that "shall-issue regimes" often require concealed carry applicants to undergo a background check does not relieve a reviewing court from its duty to engage in a historical analysis of the State's justification of the challenged firearm regulation. Accordingly, I would decline to follow *Gunn*. Recently, the Fourth District upheld the constitutionality of the FOID Card Act in *Guns Save Life Inc. v. Kelly*. I disagree with the majority and concurrent opinions in that case and would instead adopt the cogently reasoned dissent of Justice DeArmond.

20

¶ 48    Having reviewed the State's scant historical reference and the Illinois precedent upon which it relies, I would find that the State has failed to meet its burden to demonstrate that criminalizing an individual's possession of a firearm without a FOID card is consistent with this nation's historical tradition of firearm regulation. Accordingly, I would find that the FOID Card Act is facially unconstitutional. First, the Act targets conduct at the core of the second amendment—possession of a firearm. Second, the State has failed to produce any historical analogues that the FOID Card Act is consistent with this nation's historical tradition of firearm regulation. I do not find this surprising, since none exists.

> "It is equally evident from the studies of historical tradition found in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, there is no historical tradition of prohibiting all persons from acquiring or possessing firearms first, and then determining whether they fall within the class of persons otherwise entitled to or excluded from exercising that preexisting right codified by the founders in the second amendment." *Kelly*, 2025 IL App (4th) 230662, ¶ 132 (DeArmond, J., dissenting).

On the contrary, there is historical evidence that the government *required* citizens to arm themselves.[3]

---

[3]"[I]n 1631, Virginia required: 'That men go not to work … without their arms. All men that are fitting to bear arms shall bring their pieces to the church, [and] upon pain of every offense … pay 2 lb. of tobacco.' " *The Statutes … of Virginia* (1823), Vol. I, pp. 127, 173-74, Act XLVIII and Act LI; see also Vol. II, p. 333 (1675-1676).

In 1658, Virginia required its citizens to have a functioning firearm in their home. *The Right to Keep and Bear Arms*, United States Senate, p. 5; see also *The Statutes … of Virginia* (1823), Vol. II, pp. 304-305, Act II (1673); see also Vol. I, p. 525, Act XXV (1658-1659).

\* \* \*

In 1650, Connecticut required its citizens to possess ammunition and powder. *The Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford: Silus Andrus, 1830), p. 73.

In 1770, Georgia required its citizens to carry firearms to places of public worship. Ga. Legislature, *Statutes, Colonial and Revolutionary, 1768 to* [*1805*], in 19 Colonial Records of the State of Georgia, pt. 1 at 137. (Allen D. Candler, ed., 1911). Barton, *supra* at 30-32.

¶ 49    As discussed in *Bruen*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are ' "*central*" ' considerations when engaging in an analogical inquiry." (Emphasis in original.) *Bruen*, 597 U.S. at 29 (quoting *Heller*, 554 U.S. at 599). As the *Rahimi* Court explained:

>       "Why and how the regulation burdens the right are central to this inquiry. [Citation.] For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692.

¶ 50    As to the "why" the FOID Card Act burdens a law-abiding citizen's right to armed self-defense, the Act was established "to promote and protect the health, safety and welfare of the public." 430 ILCS 65/1 (West 2022). It is difficult to imagine a more vapid description of legislative purpose, which could be the justification for *any* legislative enactment. It seeks to accomplish this purpose by requiring any citizen to register personal information in a government database in an effort to prove that they are "eligible" to exercise their second amendment rights. No historical analogue requires all citizens to prove their "eligibility" to the government before exercising their second amendment right. The FOID Card Act clearly burdens a citizen's right beyond anything that was done at the founding. See *Rahimi*, 602 U.S. at 692.

¶ 51    I acknowledge that some constitutional rights, including the second amendment, are not absolute.[4] An individual cannot yell "fire" in a crowded theater. See *Schenck v. United States*, 249

---

[4]The Supreme Court in *Bruen* recognized that " '[l]ike most rights, the right secured by the second amendment is not unlimited.' " 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). " 'From Blackstone

U.S. 47, 52 (1919). However, a citizen's right to speak freely before a school board or city counsel is not conditioned on securing permission from the government and paying a fee. The government may enact criminal laws against polygamy. *Reynolds v. United States*, 98 U.S. 145 (1878). However, the right of a citizen to worship in the church of their choice is not conditioned upon government permission and the payment of a fee. A child witness in a sexual abuse trial can testify by one-way closed circuit television. See *Maryland v. Craig*, 497 U.S. 836 (1990). However, the right of an accused to confront the witnesses against him is not conditioned upon government permission and the payment of a fee. Officers may enter a private residence and search without a warrant under exigent circumstances. See *Payton v. New York*, 445 U.S. 573 (1980). However, the right of a citizen to be free from unreasonable searches and seizures is not conditioned upon government permission and the payment of a fee. The right of an accused to a speedy and public jury trial is not conditioned upon government permission and the payment of a fee. Neither a citizen's rights *against* self-incrimination, double jeopardy, and cruel and unusual punishments, nor the right *to* subpoena witnesses, court-appointed counsel, and due process are conditioned upon governmental permission and the payment of a fee.

> "We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." *Bruen*, 597 U.S. at 70-71.

---

through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " *Id.* (quoting *Heller*, 554 U.S. at 626).

23

The second amendment did not create a new right; rather, it codified a preexisting right " 'inherited from our English ancestors.' " *Heller*, 554 U.S. at 599-600, 603 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

¶ 52    In *Heller*, the Supreme Court recognized that citizens must be permitted to use handguns "for the core lawful purpose of self-defense." *Id*. at 630. In the plethora of conflicting, post-*Bruen* case law, it is rarely, if ever, acknowledged that the core purpose of self-defense is not limited to defense of hearth and home. The core purpose of self-defense extends to defense against a tyrannical government, *especially* our own. In support, one need look no further than one of the most consequential documents ever written:

> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the *consent of the governed*,—That whenever any Form of Government becomes destructive of these ends, *it is the Right of the People to alter or to abolish it*, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness." (Emphases added.) The Declaration of Independence ¶ 2 (U.S. 1776).

¶ 53    Thomas Jefferson reaffirmed this assertion in a letter dated November 13, 1787, to William Stephens Smith, the son-in-law of John Adams, when he wrote:

> "What country before ever existed a century and half without a rebellion? And *what country can preserve its liberties if their rulers are not warned from time to time that their people preserve the spirit of resistance? Let them take arms*…What signify a few lives lost

24

in a century or two? *The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants.*" (Emphases added.) From Thomas Jefferson to William Stephens Smith, 13 November 1787, *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0348. [Original source: *The Papers of Thomas Jefferson*, vol. 12, *7 August 1787–31 March 1788*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 355-357.]

In his annotated edition of *Blackstone*'s *Commentaries*, St. George Tucker[5] declared:

"The right of self-defense is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. *Wherever…the right of the people to keep and bear arms is, under any color or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.*" (Emphasis added.) *Blackstone's Commentaries: With Notes and Reference,* St. George Tucker, editor (Philadelphia: William Young Birch, and Abraham Small, 1803), Vol. I, p. 300. David Barton, *The Second Amendment: Preserving the Inalienable Right of Individual Self-Protection* 17 (1st ed. 2000).

Presenting a concurring view, William Rawle[6] explained:

"In the second [amendment], it is declared…that 'the right of the people to keep and bear arms shall not be infringed.' The prohibition is general. No clause in the constitution could, by *any* rule of construction, be conceived to give to the Congress a power to disarm the

---

[5]St. George Tucker was an attorney, an officer twice wounded during the American Revolution, and one of the leaders of the 1786 Annapolis Convention, which led to the convening of the Constitutional Convention in 1787. Tucker was a law professor in the College of William and Mary, a justice on the Virginia supreme court, and a federal judge under President James Madison. Barton, *supra* at 17.

[6]William Rawle, a U.S. Attorney who later founded an early legal society that became a law academy, published one of America's first extensive commentaries on the Constitution. Barton, *supra* at 17-18.

people. A flagitious attempt could only be made under some general pretense by a State legislature. But if, in any blind pursuit of inordinate power, either should attempt it, *this Amendment may be appealed to as a restraint on both*." (Emphases added.) William Rawle, *A View of the Constitution of the United States of America*, second edition (Philadelphia: Philip H. Nicklin, 1829), pp 125-126. Barton, *supra* at 17-18.

¶ 54    "As a leading and early proponent of emancipation observed, 'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.' " *Rahimi*, 602 U.S. at 690 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868)). Referencing the second amendment, Joseph Story[7] declared:

> "There can be no freedom where there is no safety to property or personal rights. Whenever legislation … breaks in upon personal liberty or compels a surrender of personal privileges, upon any pretext, plausible or otherwise, it matters little whether it be the act of the many or the few, of the solitary despot or the assembled multitude; it is still in its essence tyranny. It matters still less what are the causes of the change; rather urged on by a spirt of innovation, or popular delusion, or State necessity (as it is falsely called), it is still power, irresponsible power, against right." Joseph Story, *A Discourse Pronounced Upon the Inauguration of the Author, as Dane Professor or Law in Harvard University on the Twenty-Fifth Day of August, 1829* (Boston: Hilliard, Gray, Little, and Wilkins, 1829), p. 14. Barton, *supra* at 20-21.

In 1833, Story stated:

---

[7]Joseph Story was the founder of Harvard Law school, the youngest justice ever appointed to the United States Supreme Court, and he has been called a "father of American jurisprudence." Barton, *supra* at 20-21.

"The *right of the citizens to keep and bear arms has justly been considered as the palladium of the liberties of a republic since it offers a strong moral check against the usurpation and arbitrary power of rulers*; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them…there is certainly no small danger that indifference may lead to disgust, and disgust to contempt, and thus gradually undermine all the protection intended by this clause of our national Bill of Rights." (Emphasis added.) Joseph Story, *Commentaries on the Constitution of the United States*, Vol. III, pp. 746-747, § 1889 and § 1890. Barton, *supra* at 20.

¶ 55 Indeed, some provisions of the Bill of Rights were to protect the people of the United States against arbitrary action by their own government.[8] 16 Am. Jur. 2d *Constitutional Law* § 8. Most of our founders agreed with Thomas Paine's statement:

"Society in every state is a blessing, but *Government, even in its best state, is but a necessary evil; in its worst state an intolerable one*: for when we suffer, or are exposed to the same miseries by a government, which we might expect in a country without government, our calamity is heightened by reflecting that we furnish the means by which we suffer." (Emphasis added.) Thomas Paine, 1737-1809. *Thomas Paine's Common Sense: The Call to Independence*. Woodbury, N.Y.: Barron's Educational Series, Inc., 1975.

¶ 56 *Heller* made it clear that the individual right of self-defense is "deeply rooted in this Nation's history and tradition." (Internal quotation marks omitted.) *McDonald*, 561 U.S. at 767 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). "As we noted in *Heller*, King George III's attempt to disarm the colonists in the 1760's and 1770's provoked polemical reaction

---

[8]See *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990) ("available historical data show, therefore, that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government").

by Americans invoking their right as Englishmen to keep arms." (Internal quotation marks omitted.) *McDonald*, 561 U.S. at 768.

¶ 57    The constitutional infirmity of the FOID Card Act is that it transforms the *right* to keep and bear arms into a *privilege*. United States Supreme Court Chief Justice John Roberts said "[t]he spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to seize the local farmers' arms and powder stores." *Rahimi*, 602 U.S. at 690. I respectfully take issue with our Chief Justice. There is a credible argument to be made that the spark was actually struck in 1761, during Paxton's case, when Attorney James Otis Jr. argued against British "Writs of Assistance," which authorized British soldiers to conduct warrantless searches of colonists' homes for smuggled or untaxed goods. Otis's five-hour oration laid down many concepts foundational to our democracy. In attendance was future president John Adams, who later wrote of Otis's speech: "American independence was then and there born. \*\*\* [It] was the first scene of the first act of opposition to the arbitrary claims of Great Britain." From John Adams to William Tutor, Sr., 29 March 1817; see *The Revolutionary*, Stacy Schiff, pgs. 66-67. Regardless of the revolution's origin, had the colonists been forced to ask King George III for permission to possess a firearm, that spark would have fizzled, the shot heard " 'round the world' " would never have been fired, and our judiciary would still be wearing powdered wigs.

¶ 58    Accordingly, I would find that the FOID Cart Act violates the second amendment to the United States Constitution as applied to the States through the fourteenth amendment. (U.S. Const., amend. XIV). Because the defendant's conviction under section 24-1.6(a)(1), (a)(3)(C) was predicated on his failure to possess a FOID card, the requirement for which I would find to be unconstitutional, I would reverse the trial court's dismissal of his section 2-1401 petition and vacate the defendant's conviction.

28